UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        No. 3:06-CR-84
                                     )        (JORDAN/SHIRLEY)
WILLIE JOHNNY ODOMS,                 )
                                     )
            Defendant.               )

## REPORT & RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28
U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District
Court as may be appropriate. This matter comes before the Court upon the defendant's Motion to
Suppress [Doc. 15], which was filed on September 8, 2006, and the defendant's Supplemental
Motion to Suppress [Doc. 18], which was filed on September 21, 2006. The parties came before the
Court for a suppression hearing on October 10, 2006. The Government was represented by Assistant
United States Attorney Tracee J. Plowell. The defendant, Willie Johnny Odoms ("Defendant"), who
was also present, was represented by Russell T. Greene. At the conclusion of the hearing, the Court
took the motion and related filings under advisement.

Defendant is charged in a two-count Indictment [Doc. 2] alleging that on or about
June 29, 2006, Defendant, having previously been convicted of a felony, possessed a firearm (count
one), and possessed body armor (count two). Defendant argues that he was unlawfully seized in
violation of his Fourth Amendment rights on June 29, 2006, and that the subsequent search was

therefore unconstitutional. [Docs. 15 and 18]. The government opposes Defendant's motion, arguing that the Terry stop and subsequent arrest were lawful and that the evidence obtained incident to that arrest was lawfully obtained. [Doc. 16].

## I.    SUMMARY OF TESTIMONY

### a.    Testimony of Officer Michael Fowler

At the suppression hearing, the Government presented the testimony of Officer Michael Fowler ("Fowler") of the Knoxville Police Department ("KPD"). Fowler testified that he has served in the Patrol Division of the KPD for five years, that he had served in the Sutherland Avenue and Sequoia Hills area for the past year, and had served in the Lonsdale and Western Heights area for the prior four years. Fowler stated that he was responsible for detecting and deterring criminal activity in his patrol area and to take action against any criminal activity he observed. Fowler indicated that he had mad over one thousand arrests, but that only approximately ten percent of those were gun related. Fowler noted that he works the shift running from 9:30 p.m. through 7:30 a.m. in a marked police vehicle, that his vehicle is equipped with audio and video recording equipment, and that he works alone.

Fowler testified that on June 29, 2006, at approximately 12:30 a.m., he received a report of a disturbance at Tie Dye Tattoo, located at 2608 Sutherland Avenue. Fowler stated that he responded to the call, and that Sergeant Tanner ("Tanner") was already on the scene when Fowler arrived. Fowler indicated that he and Tanner interviewed the complainant ("Complainant"), that Complainant said that he had been in an argument with Defendant, and that Defendant had threatened to get a gun and shoot Complainant. Fowler noted that he could not remember whether

Complainant identified Defendant by name, or merely by description. Fowler said that he had spoken with both Defendant and Complainant about an unrelated matter on the previous night.

Fowler testified that Complainant said that he was in fear for his life and the lives of his family. Fowler further testified that Complaint said that he had seen Defendant carrying a gun before, so Complainant believed that Defendant might carry out his threat. Fowler stated that Complainant said that Defendant had a business located near the Shell station on Sutherland Avenue, and that Defendant had left the scene in a red Dodge Intrepid.

Fowler testified that, after interviewing Complainant, Fowler drove west on Sutherland Avenue, toward the Shell station. Fowler stated that he pulled into the Shell station, did not see Defendant in the area, and then continued westbound on Sutherland Avenue. Fowler said that he then saw a red Dodge Intrepid ("Intrepid") driving south on Hollywood Road. Fowler indicated that the Intrepid turned right onto Sutherland Avenue and proceeded westbound on Sutherland Avenue. Fowler testified that, in executing the turn onto Sutherland Avenue, the Intrepid swung wide and crossed over the double yellow lines into the oncoming lane of traffic. Fowler further testified that the Intrepid continued driving westbound while in the eastbound lane of Sutherland Avenue for approximately thirty to forty feet, then corrected itself and continued west in the westbound lane of Sutherland Avenue.

Fowler testified that, after observing the Intrepid's traffic violation, he activated his emergency equipment and attempted to stop the Intrepid. Fowler stated that the Intrepid did not stop, but instead continued west on Sutherland Avenue, then turned north onto Renford Road, then turned east onto Kelly Place, then turned north onto Hillview Road and stopped on Hillview Road approximately seventy-five feet north of Kelly. Fowler said that he had his police lights on the

entire time, that he continued to follow the Intrepid, and that he activated his air horn multiple times to alert the driver of the Intrepid to the officer's presence.

Fowler testified that, after stopping on Hillview Road, Defendant exited the Intrepid from the driver's door. Fowler said that he approached Defendant, and that, based upon Defendant's alleged threat of going to get a gun, the report that Defendant had been seen with a gun in the past, Defendant's erratic driving, indicating he might be under the influence, and the fact that Defendant did not stop his vehicle immediately, Fowler felt that he should pat down Defendant for officer safety. Fowler stated that, when he went to pat down Defendant, he felt the straps of what Fowler believed to be a bullet resistant vest on Defendant's shoulders. Fowler indicated that he then felt that he should handcuff Defendant, because the presence of the bullet resistant vest indicated that Defendant might be dangerous.

Fowler testified that Defendant reacted violently when Fowler attempted to handcuff him. Fowler stated that Defendant placed Fowler in a headlock and struck him. Fowler said that he and Defendant then fell to the ground and continued struggling. Fowler indicated that Defendant then managed to break free of Fowler's grasp and ran south on Kelly Place. Fowler testified that he radioed in that Defendant was attempting to flee and then chased after Defendant.

Fowler stated that he saw Defendant jump over some fences and then run around the side of a house. Fowler said that he continued to follow Defendant, and caught up with Defendant behind the house. Fowler indicated that, at this point, Defendant was no longer wearing a shirt or vest, only pants. Fowler testified that he wanted to be sure that this person was Defendant, so Fowler ordered the shirtless individual to the ground, and then approached to confirm his identity. Fowler stated that, as he approached, he observed that the shirtless individual was sweaty and had

leaves and twigs on him as if he had been running through brush. Fowler said that he then looked at the shirtless individual's face and confirmed that the shirtless individual was Defendant.

Fowler testified that he then backtracked from Defendant's position and found a blue Spectra Arms bullet resistant vest ("Vest") on the ground. Fowler stated that the Vest was both hot and sweaty, as if it had recently been worn. Fowler said that he placed Defendant under arrest and that a search incident to arrest and an impound inventory of the Intrepid were performed. Fowler indicated that a gun was found under the driver's seat of the Intrepid. Fowler testified that it was standard KPD procedure to inventory a vehicle prior to impounding the vehicle subsequent to the driver's arrest.

The government then played video footage from the camera located in Fowler's police cruiser. [Gov. Ex. 1]. Fowler testified that the video footage was a true and accurate recording of the events that transpired on the night of June 29, 2006. After observing the video footage, Fowler noted that no one entered the Intrepid while Fowler was chasing Defendant. Fowler testified that he felt the Vest immediately when he touched Defendant's back.

On cross-examination, Fowler testified that he had encountered Defendant the night before at the intersection of Liberty and Sutherland. Fowler said that, on that night, he had responded to a call of a suspicious person pushing a motorcycle down the street. Fowler stated that, upon arriving at the scene, he observed an apparently intoxicated individual pushing a motorcycle down the street. Fowler identified the individual pushing the motorcycle as Complainant. Fowler indicated that, while Fowler was speaking to Complainant, Defendant drove by and offered to drive Complainant home.

Fowler reiterated that, on the night of June 29, 2006, Complainant said that Complainant and Defendant had been involved in a dispute, possibly involving a repossessed vehicle. Fowler indicated that he did not remember the details of the events underlying the dispute. Fowler testified that Tanner was also present for the interview with Complainant. Fowler stated that he was unaware of any previous 911 calls that Complainant might have made, and did not know if Complainant had reported that Defendant was selling crack out of Defendant's business. Fowler also stated that he did not know whether Tanner searched Defendant's business using a police dog and failed to find any drugs. Fowler indicated that he did not recall whether Complainant had made multiple 911 calls concerning the complaint Fowler responded to.

Fowler testified that he did recall another individual being with Complainant, but did not recall Complainant saying that he could take care of himself because he had someone with him. Fowler stated that Complaint also alleged that a vehicle full of young African-Americans had been driving up and down the street, threatening Complainant. Fowler also stated that he did not observe such a vehicle that night. Fowler testified that he believed Complainant. Fowler further testified that he was not sure whether the 911 tapes corroborated that Complainant had said that he was in fear of his life.

Fowler stated that Defendant was not speeding, and that the only traffic law he violated was crossing over the double yellow line and driving in the oncoming lane of traffic. Fowler said that, upon getting out of the Intrepid, Defendant appeared to drop a cell phone and stopped to pick it up. Fowler indicated that he then approached Defendant and asked Defendant to get against the vehicle. Fowler was again shown the video footage from his police cruiser. [Gov. Ex. 1]. Fowler testified that the footage at timestamp 00:52:33 showed when Fowler touched

Defendant's shoulders, but that Fowler's body obstructed the line of sight, so you could not actually see Fowler touching Defendant's shoulders.

Defense counsel showed Fowler the affidavit prepared to support the complaint against Defendant, which stated that Fowler "frisked" Defendant. Fowler indicated that he neither prepared, nor signed the affidavit, and did not remember telling anyone that he "frisked" Defendant and then felt the Vest. Fowler testified that he did prepare the warrant in this matter, including the narrative portion of the warrant. Fowler agreed that the warrant indicated that Defendant was found to be wearing a Spectra Arms bullet resistant vest. Fowler also prepared an incident report describing the events of the night of June 29, 2006. Fowler stated that the incident report said that he "went to detain suspect and when I put hands on suspect it was immediately apparent [Defendant] was wearing a bullet proof vest under his shirt."

Fowler testified that, because of Defendant's resistance, he did not actually conduct a Terry pat down. Fowler reiterated that he could feel the Vest when he was turning Defendant around, but that you can't see that on the video footage because Fowler's body is in the line of sight. Fowler stated that he did not know of any prior drug complaints against Defendant, and Fowler could not remember the underlying cause of the dispute between Defendant and Complainant, other than that it somehow involved a vehicle transaction. Fowler again said that he did not observe any African-American youths in a vehicle on the night in question.

Fowler testified that it was another officer who actually performed the search of the Intrepid, the first officer on the scene after Fowler. Fowler stated that the gun found in the Intrepid was under the driver's seat, but Fowler was not sure whether the gun was holstered, nor how far it was under the seat.

On redirect examination, Fowler testified that it was during the interview of Complainant that Complainant indicated that he was in fear for his life and the lives of his family. Fowler stated that he stopped Defendant because of both the traffic violation and the report made by Complainant. Fowler indicated that he had intended to perform a <u>Terry</u> pat down of Defendant, but was unable to do so because Defendant attacked the officer. Fowler said that Defendant's wrists were sweaty, and based on the fact that Defendant apparently did not want to stop, that his wrists were sweaty, and that he might try to run, Fowler felt he should handcuff Defendant. Fowler emphasized that, for safety purposes, he should secure Defendant before performing the pat down.

Fowler testified that he would have performed a <u>Terry</u> pat down, even after handcuffing Defendant, because other officers have been attacked by handcuffed suspects, so handcuffs alone were not enough to ensure officer safety. Fowler stated that he was not initially going to handcuff Defendant, but was just going to hold Defendant's hands behind Defendant's back. However, Fowler stated that Defendant's hands were sweaty, and Defendant was trying to pull away, so at that point Fowler felt it necessary to handcuff Defendant.

## II.   FINDINGS OF FACT

The Court finds that, around 12:42 a.m. on June 29, 2006, Fowler arrived at Tie Dye Tattoo, located at 2608 Sutherland Avenue, in response to a 911 call made by Complainant. Tanner was already at the scene and interviewing Complainant when Fowler arrived. Fowler and Tanner continued interviewing Complainant for approximately seven minutes after Fowler arrived. During the interview, Complainant indicated that: he had been involved in an argument with Defendant; that Defendant had threatened to get a gun and return and shoot Complainant; that Complainant was in fear of his life and the lives of his family; that complainant had previously observed Defendant with

a gun; that Defendant owned a business located near the Shell Station on Sutherland Avenue; and that Defendant was driving a red Dodge Intrepid and had left the scene heading westbound on Sutherland Avenue, toward the Shell Station.

At approximately 12:49 a.m. Fowler left Tie Dye Tattoo and proceeded westbound on Sutherland Avenue toward the Shell Station. At approximately 12:51 a.m. Fowler arrived at the Shell Station, drove through the parking lot of the Station, did not observe anything unusual, and then continued driving westbound on Sutherland Avenue. A few seconds after leaving the Shell Station, Fowler observed a red Dodge Intrepid driving south on Hollywood Road toward the intersection of Hollywood Road and Sutherland Avenue. Fowler saw the driver of the Intrepid turn right from Hollywood Road onto Sutherland Avenue, but the Intrepid swung wide when executing the turn, crossing over the double yellow lines and driving westbound for approximately six seconds in the eastbound lane of traffic before correcting and proceeding westbound in the westbound lane of traffic on Sutherland Avenue.

At that point Fowler activated his emergency equipment and began following the Intrepid. The Intrepid did not stop immediately, but instead continued west on Sutherland Avenue, then turned north onto Renford Road, then turned east onto Kelly Place, then turned north onto Hillview Road, and finally stopped on Hillview Road approximately seventy-five feet north of Kelly. Fowler continued fowling the Intrepid, occasionally sounding his air horn. A period of approximately thirty seconds passed from the time when Fowler initially activated his emergency equipment and the time when the Intrepid stopped.

At approximately 12:52 a.m. Defendant exited the Intrepid from the driver's door, dropped his cell phone, picked it up, and began walking to the back of the Intrepid, toward Fowler's

police cruiser. At the same time, Fowler exited his police cruiser, approached Defendant, and ordered Defendant to get against the Intrepid. Defendant continued walking behind the Intrepid, and Fowler grabbed Defendant by the arms and pulled Defendant's hands behind Defendant's back. Fowler intended to hold Defendant's hands behind Defendant's back and conduct a <u>Terry</u> pat down for officer safety, but while attempting to restrain Defendant in this manner, Fowler felt what he believed to be a bullet resistant vest under Defendant's clothing. Fowler also noticed that Defendant's hands and wrists were sweaty.

After feeling the vest, Fowler attempted to handcuff Defendant, but Defendant broke free from Fowler's grip and the two men began to struggle. The two men struggled briefly, and Defendant struck Fowler. Defendant soon managed to break away from Fowler and ran south along Kelly Place. Fowler radioed dispatch to inform them Defendant was fleeing and then pursued Defendant on foot. Defendant ran through some bushes and jumped over some fences, and finally ran around a house. Fowler briefly lost sight of Defendant, but pursued him around the house. After coming to the rear of the house, Fowler observed an African-American male standing in the back yard of the house naked from the waist up. Fowler ordered the man to the ground, approached the man, and observed that the man was sweaty, had several leaves and twigs on him, and then identified the individual as Defendant.

Fowler backtracked along Defendant's path and discovered a blue Spectra Arms bullet resistant vest laying on the ground. The vest was warm and sweaty, as if it had been worn recently. Fowler then placed Defendant under arrest. By this time other officers had arrived on the scene, and one of the officers searched Defendant's Intrepid, discovering a gun under the driver's

seat.  No one entered the Intrepid between the time Defendant fled on foot and the time the police searched the vehicle.

### III.    POSITIONS OF THE PARTIES

Defendant argues that Fowler had neither probable cause, nor a reasonable and articulable suspicion that Defendant had committed, was committing, or was about to commit a crime, or that Defendant was armed or dangerous prior to stopping Defendant on June 29, 2006. Defendant argues that, even if the stop was supported by probable cause to believe that a traffic violation had occurred, that the detention was improperly prolonged and that the arrest was not supported by statutory authority.  Therefore, because the police did not have sufficient grounds to stop and arrest Defendant, Defendant argues that the evidence obtained as a result should be suppressed.  Defendant further argues that the video tape footage from Fowler's patrol cruiser indicates that Fowler never actually performed a <u>Terry</u> pat down, and therefore could not have felt a bullet resistant vest.  Finally, Defendant argues that Defendant was effectively under arrest when Fowler grabbed Defendant by the arm, and that Fowler did not have the probable cause necessary to support an arrest at that time.

The government responds that the detention and subsequent arrest of Defendant were both lawful and that the evidence obtained incident to the detention and arrest were lawfully obtained.  The government contends that Fowler had reasonable, articulable suspicion sufficient to support a <u>Terry</u> stop of Defendant for the following reasons: (1) Complainant had reported that Defendant had stated he was going to get a gun and would return and shoot Complainant; (2) Fowler observed Defendant commit a traffic violation.

# IV. ANALYSIS

## A. Propriety of the Stop

The first issue the Court must address is whether Fowler properly stopped Defendant on June 29, 2006. Defendant argues that the stop was not supported by reasonable suspicion. The government argues that Fowler had reasonable suspicion to stop Defendant based upon Complainant's report and the alleged traffic violation.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. However, a temporary seizure under the Fourth Amendment is not unreasonable for investigative purposes, in what is referred to as a <u>Terry</u> stop, where the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur. <u>Terry v. Ohio</u> 393 U.S. 1, 20 (1968); <u>Farm Labor Org. Comm. v. Ohio State Highway Patrol</u>, 308 F.3d 523, 543-44 (6th Cir. 2002). Under <u>Terry</u>, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. <u>United States v. Martin</u>, 289 F.3d 392, 398 (6th Cir. 2002). If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. <u>Id.</u> at 397.

Defendant argues that Fowler did not have the requisite reasonable suspicion and the stop was therefore unlawful. For the purposes of reasonable suspicion analysis, Fowler had to have reasonable suspicion to detain Defendant as of the moment when Fowler activated his emergency equipment in an attempt to stop Defendant. Therefore, the Court must now determine, under a totality of the circumstances analysis, whether the stop was constitutionally permissible. In other words, the Court must determine whether Fowler had a reasonable suspicion, supported by

articulable facts, that the defendant was engaged in criminal activity when he stopped Defendant. Terry, 393 U.S. at 20; Farm Labor Org. Comm., 308 F.3d at 543-44. In evaluating the constitutionality of an investigative stop, the Court engages in a two-part analysis of the reasonableness of the stop. First, the Court asks, "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion" of criminal activity. United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993).

The government contends that the Investigators had reasonable suspicion to stop Defendant based upon the report made by Complainant and the fact that Fowler observed Defendant commit an alleged traffic violation. Defendant contends that Fowler lacked the requisite reasonable suspicion necessary to support a stop.

Initially, the Court notes that, when reviewing a challenge to an investigative stop, the Court assesses the reasonableness of the officer's suspicion that criminal activity "may be afoot" in light of the totality of the circumstances, giving due weight to specific reasonable inferences which officers are entitled to draw from the facts. United States v. Bailey, 302 F.3d 652, 658 (6th Cir. 2002); see also United States v. Jones, 75 Fed. Appx. 334, 337-38 (6th Cir. 2003) (holding that "[o]fficers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person"). The likelihood of criminal activity "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Zabawa, 134 Fed. Appx. 60, 62 (6th Cir. 2005) (quoting Arvizu, 534

U.S. at 273).  In other words, there must be a "minimal level of objective justification" for making the stop.  United States v. Moreno, 43 Fed. Appx. 760, 764 (6th Cir. 2002).

Furthermore, the Court notes that, "[p]articularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible."  United States v. Hensley, 469 U.S. 221, 229 (1985).  Nevertheless, officers must still possess reasonable suspicion that the person stopped is the person who perpetrated the crime endangering the public.  See Florida v. J.L., 529 U.S. 266 (2000) (holding that the police may not stop a person based upon an anonymous tip of illegal possession of a firearm absent corroboration of predictive behavior).  However, when a complainant identifies himself, and the police are able to contact the complainant to confirm a complaint, then the complainant merits a higher level of trustworthiness.  See United States v. Howard, 150 Fed. Appx. 476, 479-80 (6th Cir. 2005).

Additionally, the Sixth Circuit has affirmed a finding of reasonable suspicion when a vehicle was stopped at a location consistent in timing and direction with a vehicle reported to have fled a crime scene.  See United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000).  In holding that the officer had reasonable suspicion to stop the defendant, the Hurst court observed that the defendant's car "roughly match[ed]" the description given by the victim in color and style as well as matching a second, more distinctive description subsequently given by an off-duty officer.  Id. at 757.  It also emphasized that the car was traveling in the reported direction and was spotted "at a location consistent with the time needed to travel to that point from the [burglary victim's] residence."  Id.; see also United States v. Long, No. 05-5692, 2006 U.S. App. LEXIS 24584, at *10-

14 (6th Cir. Oct. 2, 2006) (holding that sufficient reasonable suspicion to justify the stop of a vehicle was present where information in the dispatch call matched observations by the officer in the field).

Finally, the Court notes that if an "officer has probable cause to believe that a traffic violation has occurred, or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. When determining the existence of probable cause to stop for a traffic violation, courts

> focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.

Ferguson, 8 F.3d at 391. Additionally, the Court notes that Tennessee law requires all vehicles to be driven on the right side of the road, except under specific conditions which are not present in the instant case.[1] Tenn. Code Ann. § 55-8-115.

Thus, the Court finds, giving due weight to the experience and specialized training of Fowler, that (1) the complaint against Defendant was made by Complainant, a known and

---

[1]The Court notes that section 17-166 of the Knoxville City Code of Ordinances adopts state law on this issue.

identified person, not an anonymous caller; (2) Fowler spoke directly with Complainant, had the opportunity to weight Complainant's credibility, and believed Complainant's allegation that Defendant had threatened to shoot Complainant and that Defendant had previously been seen with a gun; (3) Complainant told Fowler that Defendant had fled in a Red Dodge Intrepid, and was last seen driving westbound on Sutherland Avenue; (4) Defendant was driving a red Dodge Intrepid and was observed at a time and place consistent with the report made by Complainant; (5) Fowler observed Defendant cross over a double yellow line and drive in the right lane of traffic, in violation of state and local law; and (6) it was reasonable for Fowler to believe that Defendant might be the person driving the Intrepid which Fowler observed commit a traffic violation. Based on the foregoing, the Court finds that Fowler had reasonable suspicion to believe that Defendant was driving the Intrepid and that criminal activity was afoot. More specifically, the Court finds that Defendant's traffic violation, coupled with Defendant's proximity in both time and place to Tie Dye Tattoo, and the fact that Defendant's vehicle matched the description of the vehicle described by Complainant provided the requisite reasonable suspicion for Fowler to conduct a <u>Terry</u> investigation.

Accordingly, the Court finds based on the totality of the circumstances, including the information known to the officers as set forth above along with reasonable inferences that could be drawn from the cumulative information available to them at the time of the stop, that the officers had reasonable, objective suspicion to conduct a <u>Terry</u> investigation. Thus, Defendant's seizure was constitutionally permissible.

**B.    Propriety of the Detention and Frisk**

Having concluded that the basis for the investigative stop was proper, the Court must next determine whether the detention was reasonable, that is, (1) was it sufficiently time limited, and (2) were the investigative means used the least intrusive means reasonably available." Bennett v. City of Eastpointe, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted).  Defendant contends that Fowler did not have the requisite reasonable suspicion to frisk Defendant and search his car.  Defendant further argues that Defendant's detention exceeded the scope permissible under Terry, and instead escalated into an impermissible arrest when Fowler laid hands on Defendant.  The government contends that Fowler had specific and articulable facts causing him to believe Defendant could be armed and dangerous and that handcuffing Defendant and conducting a frisk was warranted.

When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range is armed and dangerous.  Terry, 392 U.S. at 26-27;  United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999).  "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger."  Terry, 392 U.S. at 27; see also United States v. Thomas, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005).  In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence."  United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003).  In determining whether an officer's suspicion of danger and subsequent conduct are

reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27.

Furthermore, if an officer has a reasonable belief that a suspect is dangerous, the officer may order the suspect to get out of the car and may detain the suspect at gunpoint during an investigatory stop. See United State v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as part of a Terry stop based upon a tip that the occupants were armed). "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001).

In the instant case, Fowler was responding to a complaint involving a threat of gun violence. The timing, location, and description of Defendant's vehicle matched the description of the suspect vehicle in Complainant's report. Based on this information, the Court finds that Fowler possessed an articulable and objectively reasonable belief that Defendant was potentially dangerous, making Fowler's attempted use of handcuffs reasonably necessary. The Court further finds that, while attempting to restrain Defendant, Fowler felt what he believed to be a bullet resistant vest under Defendant's clothing.[2]

---

[2]The Court, after extensive review of Government's Exhibit 1 using the slow motion and zoom features provided by the technology available to the Court, notes that Fowler does appear to touch Defendant's shoulders, as Fowler testified. Because of the lighting, the Court cannot say with certainty that Fowler does touch Defendant's shoulder, but the video footage, coupled with Fowler's unrefuted testimony that he felt a bullet resistant vest through Defendant's clothing, provides the Court with clear and convincing evidence that Fowler did feel what he thought was a bullet resistant vest under Defendant's clothing.

Having found that Fowler possessed a reasonable belief that Defendant was dangerous and that Fowler's safety was at risk, the Court also finds that Fowler was "entitled to take steps to ensure that [Defendant was] not armed" and could properly frisk Defendant for weapons. See Terry, 392 U.S. at 27 (holding that an officer may frisk a suspect for weapons as a part of an investigatory detention if the officer reasonably believes that his safety is at risk). The Court finds that Fowler, having reasonable grounds to believe that Defendant was armed and dangerous, attempted to perform a restricted search for any weapon that could be used against him, but was unable to complete the search. The Court also finds that the seizure was sufficiently limited in both duration and scope, and was fully within the bounds of a permissible Terry stop. Thus, despite defense counsel's urging, the Terry stop did not escalate into an impermissible arrest when Fowler laid hands on Defendant while attempting to perform the permissible Terry stop.

The Court notes that Defendant cites Knowles v. Iowa, 525 U.S. 113 (1998), arguing that it holds that a defendant is placed under arrest by at the officer "at the moment the officer [grabs] the defendant's arm." [Doc. 18]. After reviewing Knowles, the Court cannot agree. The Knowles Court considered the constitutionality of an Iowa law allowing for a "search incident to citation," and in no way discussed whether a defendant was effectively placed under arrest when a police officer lays hands on the defendant. See Id. at 115. Thus, for the reasons discussed above, the Court finds that Defendant was not placed under arrest when Fowler laid hands on Defendant in an attempt to restrain him.

## C.       Propriety of the Arrest

Having found that the both the stop and frisk of Defendant were proper, the Court must now determine whether the arrest of Defendant was supported by probable cause. Defendant

argues that the arrest was not supported by any statutory basis and was therefore unlawful. The government contends that the arrest was supported by probable cause and therefore lawful.

An officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). This same standard applies with respect to a misdemeanor offense. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Straub v. Kilgore, No. 02-5542, 2004 WL 1193841, **3 (6th Cir. May 27, 2004).[3]

Under Tennessee law, probable cause exists when, "the facts and circumstances within the officer's knowledge at the time of the arrest, and of which the officer 'had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" State v. Henning, 975 S.W.2d 290, 300 (Tenn. 1998) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). All of the information in the officer's possession, fair inferences therefrom, and observations, including past experience, are generally pertinent to determine if an officer has probable cause to arrest. Greer v. State, 443 S.W.2d 681, 684 (Tenn. Crim. App. 1969).

---

[3]The Court notes that under Tennessee law, Tenn. Code Ann. § 40-7-103(a)(1), a misdemeanor must have been committed in the officer's presence in order for the officer to arrest the misdemeanant without a warrant. The Sixth Circuit has held that the requirement under state law that a misdemeanor must be committed in an officer's presence in order for the officer to arrest without a warrant is not mandated by the Fourth Amendment. See Straub v. Kilgore, No. 02-5542, 2004 WL 1193841, **3 (6th Cir. May 27, 2004) (reasoning that the "in the presence" requirement under Kentucky law "is a state-provided right that is not grounded in the U.S. Constitution"); see also Atwater v. City of Lago Vista, 532 U.S. 318, 340 n.11 (2001) (declining to determine whether the Fourth Amendment requires that the misdemeanor be committed in the officer's presence).

Tennessee probable cause jurisprudence mirrors that of the United States Supreme Court and the Sixth Circuit. See Draper v. United States, 358 U.S. 307, 313 (1959)(quoting Brinegar v. United States, 338 U.S. 160, 175 (1949))(holding that "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act"); Painter v. Robertson, 185 F.3d 557, 569 (6th Cir. 1999) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37(1979))(holding that "'[p]robable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense'"). Furthermore, the Sixth Circuit has held that "the probability of criminal activity is assessed under a reasonableness standard based on 'an examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'" Crockett v. Cumberland College, 316 F.3d 571, 580 (6th Cir. 2003)(quoting Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999)); see also Hunter v. Bryant, 502 U.S. 224, 228 (1991) (holding that "[t]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be construed . . . after the fact"); Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001) (holding that "[p]robable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'"); United States v. Strickland, 144 F.3d 412, 415 (6th Cir. 1998) ("The Fourth Amendment does not require that a police officer know a crime occurred at the time the officer arrests or searches a suspect.").

The Court further notes that the Sixth Circuit has held that a crime victim's or eyewitness' report or accusation alone will generally establish probable cause and is generally entitled to a presumption of reliability and veracity. Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999); United States v. Johnson, 403 F.2d 1002, 1004 (6th Cir. 1968). Furthermore, the Sixth Circuit has held that a known informant, one whom the police can contact and question about the informant's claims, is entitled to a higher level of trustworthiness than an anonymous tipster. See Howard, 150 Fed. Appx. at 479-80. Additionally, the Court notes that assault is a misdemeanor under Tennessee Law. Tenn. Code Ann. § 39-13-101.

The Court finds that Fowler had probable cause to arrest Defendant based upon the following factors: (1) Fowler observed Defendant commit a traffic infraction in violation of Tenn. Code Ann. § 55-8-115; (2) Fowler received a report from Complainant that Defendant had threatened to get a gun and shoot Complainant, and the veracity of this report was strengthened when Fowler determined that Defendant was driving a red Dodge Intrepid, as Complainant had reported, and was observed at a time and place consistent with the report made by Complainant; (3) Defendant assaulted Fowler in violation of Tenn. Code Ann. § 39-13-101. Based upon these factors and the totality of the circumstances, the Court finds that it was reasonable for Fowler to believe that Defendant had committed one or more offenses. Given that it was reasonable for Fowler to believe that Defendant had committed one or more offenses, the Court further finds that Fowler possessed probable cause to arrest Defendant.

## C.      Propriety of the Seizure of the Bullet Resistant Vest

Having found that the stop and frisk of Defendant was proper, and that the arrest of Defendant was supported by probable cause, the Court now turns to the propriety of the seizure of

the blue Spectra Arms bullet resistant vest. The Court notes that Defendant's briefs do not specifically address the bullet resistant vest, but since Defendant has requested that all evidence in this case be suppressed, the Court will address the issue.

The Court found above that, after regaining control of Defendant, Fowler found a blue Spectra Arms bullet resistant vest laying on the ground along Defendant's path. Whether the blue Spectra Arms bullet resistant vest belonged to Defendant is an issue best left for trial, so, in considering the seizure of the vest, the Court will briefly consider both the possibility that the vest did not belong to Defendant and the possibility that the vest did belong to Defendant.

The right to be free from unreasonable searches and seizures is a personal right which may not be vicariously asserted. Rakas v. Illinois, 439 U.S. 128, 133-34 (1978). Accordingly, a defendant may only seek to suppress evidence under the exclusionary rule where that defendant's legitimate privacy interest under the Fourth Amendment has been violated. Id. at 134. It is fundamental that one challenging the reasonableness of a search or seizure has the burden of establishing a legitimate expectation of privacy in the place or property which is searched. Rawlings v. Kentucky, 448 U.S. 98 (1980). If the vest in question did not belong to Defendant, then Defendant had no legitimate expectation of privacy in the vest, nor in the place where the vest was found, and therefore it would be improper to grant Defendant's motion to suppress the vest.

If the vest did belong to Defendant, then Defendant must have discarded the vest while fleeing Fowler. As above, in order to suppress the vest, Defendant would have to show a legitimate expectation of privacy in the vest. Id. The Sixth Circuit has held that "[t]here is no reasonable expectation of privacy in an object after it has been thrown away, and the Fourth Amendment offers no bar to its seizure." United States v. Dillard, 78 Fed. Appx. 505, 512 (6th Cir.

2003). Therefore, if the vest did belong to Defendant, he lost any expectation of privacy when he discarded it, meaning Fowler could seize it. Therefore, the Court finds that the seizure of the vest did not violate Defendant's Fourth Amendment rights.

## D.      Propriety of the Automobile Search

Having found that the stop and frisk of Defendant was proper, and that the arrest of Defendant was supported by probable cause, the Court now turns to the propriety of the automobile search. Defendant argues that it was unlawful for the officers to search his vehicle. The government contends that the search of Defendant's vehicle was permissible.

As an exception to the Fourth Amendment's requirement of a warrant, an officer may search the passenger compartment of a car incident to an occupant's custodial arrest. See New York v. Belton, 453 U.S. 454, 460 (1981). Such a search incident to an arrest must be "substantially contemporaneous with the arrest." Stoner v. California, 376 U.S. 483, 486 (1964); United States v. Barnett, 407 F.2d 1114, 1119-20 (6th Cir. 1969). The fact that the arrestee is no longer in a position to reach into the car at the time of the search does not affect the propriety of the search. See United States v. White, 871 F.2d 41, 44 (6th Cir. 1989) (analyzing situation in which defendant handcuffed and detained in patrol car at time officer searched his car incident to his arrest). In fact, the Supreme Court has held that an officer may search the passenger compartment of a car incident to the defendant's arrest even when the officer did not stop the defendant until he had already left his vehicle. Thornton v. United States, 541 U.S. 615, 622 (2004).

In Thornton, the Supreme Court noted the dual reasons for permitting a search incident to arrest: (1) ensuring officer safety and (2) preserving evidence. Id. at 621. Noting the need for a bright-line rule that law enforcement could easily apply, the Supreme Court held that "[o]nce an

officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." Id. at 623. Thus, an officer's ability to search pursuant to this exception to the warrant requirement does not turn upon a finding that his safety was threatened.

Having already found that Defendant's arrest was lawful, the Court finds that the search of Defendant's automobile was a proper search incident to arrest. Accordingly, the Court finds that the search of Defendant's car and location of the gun in the present case did not violate the Fourth Amendment. The Court recommends that the District Court deny the defendant's request for suppression of the evidence stemming from his seizure and the search of the car.

## V. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case. For the reasons set forth herein, it is **RECOMMENDED** that Defendant's Motions to Suppress [Doc. 15 and 18] be **DENIED**.[4]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[4]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).